UNITED STATES BANKRUPTCY COURT
NORTHERN DISTRICT OF NEW YORK

In re:  The Albert Lindley Lee Memorial Hospital
a/k/a A.L. Lee Memorial Hospital,

                     Debtor.

Case No. 09-30845-5-mcr
Chapter 11

Appearances:

Bond, Schoeneck & King, PLLC
Attorneys for Debtor
One Lincoln Center, Suite 1800
Syracuse, New York 13202

Camille Wolnik Hill, Esq.

Andrew M. Cuomo
New York State Attorney General,
Attorney for New York State
    Department of Labor
120 Broadway, 26th Floor
New York, New York 10271

Steven Koton,
Assistant Attorney General

Hon. Margaret Cangilos-Ruiz, United States Bankruptcy Judge

## MEMORANDUM-DECISION AND ORDER

The pending objection before the court presents a question of apparent first impression in this Circuit as to whether a reimbursement claim for unemployment insurance compensation benefits paid to former employees of the Debtor filed as claim number 179 by the New York State Department of Labor, Unemployment Insurance Division ("New York" or "State"), is entitled to priority status under section 507(a)(8) of title 11 of the United States Code.[1] This court has core jurisdiction to determine the issue pursuant to 28 U.S.C. § 157(b)(2)(B), 28 U.S.C. § 1334 and the standing reference by the district court of bankruptcy cases to this court as authorized by 28 U.S.C. § 157(a) and implemented by Rule 76.1 of the Local Rules of Practice for the United States District Court for the Northern District of New York. The following

---

[1] 11 U.S.C. §§ 101 – 1532 ("Bankruptcy Code" or "Code").

1

constitutes the court's findings and conclusions pursuant to Federal Rule of Bankruptcy Procedure ("Fed. R. Bankr. P.") 7052 as made applicable by Fed. R. Bankr. P. 9014(c).

## BACKGROUND FACTS

The underlying facts are not in dispute. On April 3, 2009, The Albert Lindley Lee Memorial Hospital, a/k/a A.L. Lee Memorial Hospital ("Hospital" or "Debtor"), an acute care, nonprofit general hospital operating in Fulton, New York, filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code. The Debtor, which had operated at the same location since 1910, became subject to mandatory closure based upon recommendations regarding the status of hospitals and other health care providers in New York State that were contained in a report issued on November 28, 2006, by the Commission on Health Care Facilities in the 21st Century, commonly referred to as the "Berger Commission Report." The purpose of the Hospital's chapter 11 filing was to effect an orderly wind-down of operations and close an asset purchase agreement pursuant to which Oswego Hospital would take over certain services to ensure that Fulton-area residents have ready access to medical care. At the time of filing, the Debtor had approximately 319 active employees. Soon after filing, the Debtor began to terminate many of these employees.

The claims bar date for governmental units to file proofs of claim was set for September 30, 2009. In August 2009, New York timely filed two claims: claim number 144 and claim number 145.[2] Debtor objected to claim number 144, which was asserted as a priority claim in the amount of $12,126.51 for "unemployment insurance taxes" due for the period from April 1, 2009, through April 3, 2009. On March 11, 2010, New York amended this claim by filing claim number 179 in the amount of $1,131,303.27 (the "Claim"). The Claim covers the last three

---

[2] New York amended claim number 145 in February, 2010 by filing claim number 177; subsequently, New York withdrew both claim number 145 and claim number 177, rendering any objection to these claims moot. Accordingly, these claims are not addressed in this decision.

quarters of 2009 and the first quarter of 2010 through March 8, 2010, and represents the amount the State paid in unemployment compensation benefits to Debtor's former employees. The Debtor's liability for the benefits paid is based upon an election it made some years ago to make reimbursement payments in lieu of contributions. As more fully discussed below, this is an option afforded a nonprofit organization under New York law. The State asserts the Claim is for unpaid, unemployment insurance taxes entitled to priority under Bankruptcy Code section 507(a)(8)(D) or, alternatively, (E).

The Debtor does not take issue with the amount of the Claim. Rather, the Debtor contends that the payments in lieu of contributions owed to the State's unemployment insurance fund are not taxes entitled to priority and should be treated as a general unsecured claim.

## *FEDERAL UNEMPLOYMENT TAX ACT, NEW YORK'S UNEMPLOYMENT INSURANCE FUND AND NONPROFIT ENTITIES*

The Federal Unemployment Tax Act, 26 U.S.C. §§ 3301 *et seq.* ("FUTA") imposes an excise tax on employers, calculated on total wages paid by them during the year, to support the federal unemployment compensation system. Employers are given credit for contributions made to a state unemployment fund, provided that the state unemployment compensation law is certified as meeting the requirements of federal law. *Id.* §§ 3302 and 3304. As such, FUTA is the overall framework pursuant to which individual state unemployment compensation systems are organized and governed.

The unemployment insurance law is set forth in Article 18 of the New York Labor Law ("Unemployment Insurance Law"). Section 530 of the Unemployment Insurance Law designates the commissioner of labor ("Commissioner") as the agent of the State responsible for

administration of the unemployment insurance law.[3] The Commissioner's responsibilities include administration of unemployment insurance benefits, which are paid from New York's Unemployment Insurance Fund ("Fund"). § 550.

The Unemployment Insurance Law requires New York employers to contribute to the Fund by remitting quarterly payments. § 570. However, there is an exception to this general requirement. FUTA requires states to permit nonprofit employers to make payments in lieu of contributions. 26 U.S.C. § 3309(a)(2). Accordingly, New York allows nonprofit organizations to "elect to become liable for payments in lieu of contributions." § 563 (4). If the election is made, instead of contributing to the Fund every quarter, the nonprofit organization reimburses the Fund in an amount equal to what the Fund has actually paid out in benefits to its former employees in the prior quarter. A New York nonprofit organization that has elected to make payments in lieu of contributions must continue to file returns on a quarterly basis reflecting the total number of its employees and the remuneration paid in each calendar quarter.[4] As noted above, the Debtor made this election, as an operating, nonprofit hospital, years before it filed for bankruptcy.

The Fund consists of moneys, including but not limited to all contributions, interest, penalties, payments in lieu of contributions from nonprofit entities, and moneys credited to the State under the Federal Social Security Act. §§ 550 (1) and 563 (5). The Fund is "administered in trust and is used solely to pay benefits, except that moneys credited to the fund pursuant to the Federal Social Security Act may be used for the administration of the Unemployment Insurance Law." 3 NEW YORK EMPLOYMENT LAW § 39.02 (Jonathan L. Sulds, ed., 2009). *See* § 550. The

---

[3] Hereinafter, unless otherwise noted, all sectional references are to the Unemployment Insurance Law.
[4] 12 N.Y.C.R.R. § 472.4 (b).

4

Commissioner is required to maintain employer accounts[5] within the Fund for every employer[6] liable to the Fund. Contribution payments as well as payments in lieu of contributions are deposited into the Fund and are collectively pooled so as to be available for disbursement of unemployment insurance benefits. § 581 (1)(d).

New York Labor Law classifies its unemployment insurance system as an "experience rating" system; it outlines how employer tax rates are annually determined based upon prior employment and unemployment experience, how contributions are calculated and how employer payments, whether by contributions or reimbursement, are applied. § 581. Under New York law, payments in lieu of contributions are assessed and collected in the same manner and are subject to the same conditions as contributions due from employers. § 563 (7).

### *PRIORITY TAX STATUS UNDER BANKRUPTCY CODE § 507*

It is established law within the Second Circuit and in other jurisdictions that have addressed the issue that liabilities for state unemployment insurance contributions are "taxes" entitled to priority under both the former Bankruptcy Act of 1898 and the Bankruptcy Code. *See, e.g., State of New York v. United States (In re Independent Automobile Forwarding Corporation)*, 118 F.2d 537 (2d Cir. 1941), *aff'd in part, rev'd in part, on other grounds*; *In re Cal-Test Enter., Inc.*, No. 82-10178 M, slip op. at 8 (Bankr. W.D.N.Y. Aug. 8, 1985); *In re Ball*, No. 81-01683, slip op. at 5 (Bankr. N.D.N.Y. Nov. 10, 1983); 4 COLLIER ON BANKRUPTCY § 507.11 [5] (15th ed.). The Debtor argues, however, that these cases are inapposite because

---

[5] The accounts enable the State to account for contributions and payments in lieu of contributions as well as the charges resulting from prior benefit claims. Although funds paid by employers are credited to each respective employer's account, all of the moneys in the employer funds are pooled and available to pay benefits. UNEMPLOYMENT INSURANCE LAW § 581 (1)(d).

[6] The term "employers" as used in section 570 includes nonprofit organizations that have paid $1,000.00 or more in remuneration in any calendar quarter or have employed four or more persons on each of twenty calendar days in a year. §§ 512 (2) and 563 (3).

liabilities for contributions by for-profit entities are fundamentally distinct from liabilities for reimbursement of paid benefits by nonprofit entities. Since there is no Second Circuit precedent that addresses the priority in bankruptcy of claims for reimbursement, this court shall examine the statute and the respective policies underlying the priority scheme of the Bankruptcy Code and those underlying the unemployment insurance compensation benefits system.

Section 507 of the Bankruptcy Code lists the order of priority to be accorded certain expenses and claims. These priorities are interpreted mindful of the Bankruptcy Code's objectives to afford equal treatment to similarly situated creditors and are deemed to apply to a class of claims only as "clearly authorized by Congress." *Howard Delivery Serv., Inc., v. Zurich Am. Ins. Co.*, 126 S.Ct. 651, 655. *See also Trustees of the Amalgamated Ins. Fund v. McFarlin's, Inc.*, 789 F.2d 98, 100 (2d Cir. 1986) ("If one claimant is to be preferred over others, the purpose should be clear from the statute," citing *Nathanson v. N.L.R.B.*, 344 U.S. 25, 29 (1952)). Bearing this in mind, Code section 507(a)(8) grants an eighth priority to governmental units' unsecured claims and provides, in pertinent part, as follows:

> (a) The following expenses and claims have priority in the following order: ...
>
> (8) Eighth, allowed unsecured claims of governmental units, only to the extent that such claims are for – ...
>
> (D) an employment tax on a wage, salary, or commission of a kind specified in paragraph (4) of this subsection earned from the debtor before the date of the filing of the petition, whether or not actually paid before such date, for which a return is last due, under applicable law or under any extension, after three years before the date of the filing of the petition;
>
> (E) an excise tax on (i) a transaction occurring before the date of the filing of the petition for which a return, if required, is last due, under applicable law or under any extension, after three years before the date of the filing of the petition; or (ii) if a return is not required, a transaction occurring during the three years immediately preceding the date of the filing of the petition;

6

11 U.S.C. § 507 (a)(8)(D) and (E). The success of the State's reliance on either of the above two alternative sections to accord its Claim priority status depends initially upon its Claim being characterized as a "tax."

Whether an obligation is a "tax" for bankruptcy purposes is a question of federal law determined independently of whether or not it is denominated as such in the statute from which it arises. *City of New York v. Feiring*, 313 U.S. 283, 285 (1941); *New Jersey. v. Anderson*, 203 U.S. 483, 491- 92 (1906). In general, taxes are levied without the consent or voluntary action of the taxpayer, *Anderson*, 203 U.S. at 492, in contrast to a fee which has been held "incident to a voluntary act." *Nat'l Cable Television Assoc. v. United States*, 415 U.S. 336, 340 – 41 (1974) (comparing taxes to fees). Although the determination of a tax for bankruptcy purposes is governed by federal law, the state law which creates an obligation may be examined "to ascertain whether its incidents are such as to constitute a tax," within the meaning of the applicable bankruptcy provision. *Feiring*, 313 U.S. at 285. As defined by the Supreme Court, taxes are "pecuniary burdens laid upon individuals or their property, regardless of their consent, for the purpose of defraying the expenses of government or of undertakings authorized by it." *Feiring*, 313 U.S. at 285 (citing *Anderson*, 203 U.S. at 492).

In *United States v. Reorganized CF & I Fabricators of Utah, Inc., et al.*, 518 U.S. 213, 220 (1996), the Supreme Court had before it the issue as to whether an underfunded pension liability constituted an excise tax within the priority provision of the Bankruptcy Code. In writing the majority opinion for the court, Justice Souter explained that in determining whether a particular exaction was properly characterized as a "tax," the Court "looked behind the label placed on the exaction and rested its answer directly on the operation of the provision." *CF& I Fabricators*, 518 U.S. at 220. The Court characterized the analysis employed as a "functional

examination" that "turn[s] on the actual effects of the exactions." *CF & I Fabricators*, 518 U.S. at 224, 221 (citing *United States v. New York*, 315 U.S. 510, 514-17 (1942)). Utilizing this approach, the Court found that the exaction of an additional charge on the underfunding of certain pension plans equal to ten per cent of the funding deficiency[7] was punitive in nature and, therefore, not properly characterized as an excise tax. *Id.* at 226.

### *The* Lorber *Test*

Prior to *CF & I Fabricators*, the Court of Appeals for the Ninth Circuit enunciated a four-part test to determine whether a debtor's obligation to a government unit is a tax. *County Sanitation Dist. No. 2 of L.A. County v. Lorber Indus. of Cal. Inc. (In re Lorber Indus. of Cal.)*, 675 F.2d 1062 (9th Cir. 1982). In *Lorber*, the question was whether a surcharge assessed against the debtor for sewer use fees constituted a tax for bankruptcy purposes. Citing favorably to an earlier district court opinion, (*In re Farmers Frozen Food Co.*, 221 F.Supp. 385 (N.D. Cal. 1963)), which first employed the analysis, the *Lorber* court cited the following four elements which characterized the exaction of a "tax" under Section 64, subdivision (a)(4) of the former Bankruptcy Act of 1898:

> (a) An involuntary pecuniary burden, regardless of name, laid upon individuals or property;
> (b) Imposed by, or under authority of the legislature;
> (c) For public purposes, including the purposes of defraying expenses of government or undertakings authorized by it;
> (d) Under the police or taxing power of the state.

*Lorber*, 675 F.2d at 1066.[8]

The Second Circuit affirmatively adopted the *Lorber* test in considering whether obligations under the Coal Act that required an employer to contribute to the health and benefit

---

[7] The statute imposing the exaction under consideration by the Court in was 26 U.S.C. § 4971.
[8] In *Lorber*, the Ninth Circuit found that the charges before it were triggered by the debtor's decision to discharge large amounts of industrial wastewater, making the pecuniary burden a voluntary one and, therefore, not a tax. *Lorber*, 675 F.2d at 1067.

8

plan of retired coal miners involved the exaction of a tax. *LTV Steel Co., Inc., et al. v. Shalala (In re Chateaugay Corp.)*, 53 F.3d 478 at 498 (2d Cir. 1995). In doing so, the Second Circuit noted that although *Lorber* was decided under the former Bankruptcy Act, the *Lorber* test is equally applicable under the Bankruptcy Code. The Second Circuit applied the *Lorber* criteria and found that Coal Act obligations should be characterized as "taxes" due to their overwhelmingly involuntary nature, their explicitly stated public purpose, and their obvious potential to be imposed pursuant to the taxing power."[9] *Chateaugay*, 53 F.3d at 498.

### *Refinement of* Lorber

The Sixth Circuit was circumspect to adopt the *Lorber* criteria outright. Prior to the Second Circuit's adoption of *Lorber* in *Chateaugay*, the Sixth Circuit had occasion to identify in two separate opinions, what it perceived as a weakness in applying the *Lorber* criteria to obligations owed to the government. The Sixth Circuit opined that all money collected by the government arguably goes toward a "public purpose" to defray the expenses of government and expressed concern that every inquiry would be reduced to whether "money demanded by the Government is to be put toward 'public purposes,' including 'defraying the expenses of government.'" *Ohio Bureau of Workers' Comp. v. Yoder (In re Suburban Motor Freight, Inc.)*, 998 F.2d 338, 341 (6th Cir. 1993) ("*Suburban I*"). Concerned that under the original *Lorber* criteria, the government would always obtain priority for all moneys it was owed, the Sixth Circuit upon next addressing the issue articulated two refinements to the public purpose test of *Lorber* by further requiring: "(1) that the pecuniary obligation be universally applicable to

---

[9] *Chateaugay* was decided by the Second Circuit prior to the issuance of the Supreme Court's decision in *CF & I Fabricators*. In a later proceeding in *In re CF & I Fabricators of Utah, Inc.*, following the Supreme Court's *CF & I Fabricators* decision, the Tenth Circuit, in addressing the applicable standard for determining whether a claim should be accorded priority tax status, adopted the *Lorber* analysis and cited to the Second Circuit's decision in *Chateaugay*. *Pension Benefit Guar. Corp. v. CF & I Fabricators of Utah, Inc., et al. (In re CF & I Fabricators of Utah, Inc.)*, 150 F.3d 1293, 1297-98 (10th Cir. 1998).

9

similarly situated entities; and (2) that according priority treatment to the government claim not disadvantage private creditors with like claims." *Ohio Bureau of Workers' Comp. v. Yoder (In re Suburban Motor Freight, Inc.)*, 36 F.3d 484, 488 (6th Cir. 1994) ("*Suburban II*"). In applying the refined criteria to its analysis of the estate's liability for workers' compensation awards after the debtor failed to pay its workers' compensation premiums, it denied the claim priority status. The Sixth Circuit found that the liabilities did not qualify as taxes because (1) Suburban's liability arose from its own default in paying premiums and was, therefore, not universally applicable to similarly situated entities, and (2) private creditors with like claims, including sureties that issued bonds so that the debtor could be self-insured, would be disadvantaged by the government claim being accorded priority status. *Suburban II*, 36 F.3d at 488.

It is noteworthy that the Second Circuit did not reference the *Suburban I* decision (decided June 29, 1993) nor adopt the analysis employed in *Suburban II* (decided September 21, 1994) when it issued its decision in *Chateaugay*, which was decided on April 17, 1995. *Lorber* is still good law in this Circuit which, together with the functional examination required by United States Supreme Court precedent, will guide this court's analysis in determining the pending objection to the priority status of the State's claim.

### *UNDERLYING POLICY OF UNEMPLOYMENT INSURANCE COMPENSATION BENEFITS AND EXACTION OF REIMBURSEMENTS*

As noted previously, as with other states' unemployment insurance compensation laws, New York's law falls under guidelines mandated by FUTA. In this respect, its stated public policy is aligned with the interests of the federal government to cushion the economic impact of serious unemployment. The public policy of the State in enacting the Unemployment Insurance

Law is clearly articulated in the New York Labor Law which provides, in pertinent part, as follows:

> Economic insecurity due to unemployment is a serious menace to the health, welfare, and morale of the people of this state. Involuntary unemployment is therefore a subject of general interest and concern which requires appropriate action by the legislature to prevent its spread and to lighten its burden, which now so often falls with crushing force upon the unemployed worker and his family.

UNEMPLOYMENT INSURANCE LAW § 501. The foregoing stated policy resonates as clearly today when the need is great and jobs are few in Central New York as in 1931 when the joint legislative committee on unemployment was appointed.[10] Notwithstanding an election by a nonprofit entity to opt for reimbursement in lieu of contributions, the exaction of reimbursements, which are pooled with contributions in the Fund, is clearly intended and serves to replenish the Fund that stands ready to make disbursements to the next qualified claimant.

Debtor relies heavily on decisions from the First and Third Circuits, *Commonwealth of Mass. Div. of Employment and Training v. Boston Reg'l Med. Ctr., Inc. and Official Comm. of Unsecured Creditors (In re Boston Reg'l Med. Ctr., Inc.)*, 291 F.3d 111 (1st Cir. 2002) and *The Reconstituted Comm. of Unsecured Creditors of the United Healthcare Sys., Inc. v. State of N.J. Dep't of Labor (In re United Healthcare Sys., Inc.)*, 396 F.3d 247 (3rd Cir. 2005) to support its contention that the reimbursements in lieu of contributions due in this case are not taxes and should not be accorded priority status. Presented with an issue similar to the one before this court, in interpreting respectively, the Massachusetts and New Jersey statutory schemes each court separately concluded that reimbursement payments in lieu of contribution payments do not

---

[10] *See* UNEMPLOYMENT INSURANCE LAW § 501. "After searching examination of the effects of widespread unemployment within the state, the joint legislative committee on unemployment appointed pursuant to a joint resolution adopted April ninth, nineteen hundred thirty-one."

11

constitute taxes.[11] The court notes that the conclusions reached by the First and Third Circuits have not been widely adopted[12] and that no published opinion by a federal district court or bankruptcy court in the Second Circuit has cited to either case.[13] As noted previously, under *Chateaugay*, the proper examination in the Second Circuit remains the *Lorber* analysis.

### *Application of the Lorber and Suburban Factors*

In its Reply Memorandum supporting its objection to Claim, Debtor argues that the reimbursement payments due to New York do not satisfy the *Lorber* and *Suburban II* tests. (Debtor's Reply Mem. 12). In its memorandum, the State argues that the liabilities satisfy *Lorber* as well as the *Suburban II* factors, if the latter were deemed to apply in this Circuit. (State's Resp. Mem. 9-11). At oral argument, the Debtor was hard-pressed not to concede that each of the *Lorber* and *Suburban II* factors was met.

#### 1. Involuntary pecuniary burden

With respect to the first factor, the court finds that the liability for reimbursement payments is an involuntary pecuniary obligation. All subject employers in New York must pay into the Fund. Whether Debtor, as a nonprofit organization, elected the reimbursement method or paid quarterly contributions, Debtor was required to commit to be liable to the Fund. That Debtor in this case elected to reimburse the Fund for the amount that the Fund paid out to

---

[11] The court in *Boston Regional* found the issue a very close question but recited that "What tips the scales...is the option that the [Massachusetts] Employment and Training Law...give(s) the Division to require a nonprofit employer to provide a surety bond. A taxing authority is given preferred treatment because it is an involuntary creditor of the debtor. It cannot choose its debtors, nor can it take security in advance of the time that taxes become due.'" *Boston Regional*, 291 F.3d at 122 (citing the basis for the priority accorded as noted in the legislative history contained in H.R. Rep. No. 95 – 595 at 190 (1977)). Although the New Jersey statute also allowed the state to require a bond, the Third Circuit in *United Healthcare* did not base its conclusion on this factor, noting that under New Jersey law, the state "may require a bond for the payment of a state tax." *United Healthcare*, 396 F.3d at 258 n. 21.

[12] The well-reasoned dissent by Chief Judge Scirica in *United Healthcare* suggests adequate reasons as to why the holdings should not be extended. *United Healthcare*, 396 F.3d at 261 – 65.

[13] The single court within the boundaries of the Second Circuit that has cited to *United Healthcare* is the Supreme Court of New York County. *Kessler v. Hevesi*, 824 N.Y.S. 2d 763 (N.Y. Sup. Ct. 2006) (listed in a table). The court cited *United Healthcare* as part of a string cite regarding the characteristics of taxes specifically benefitting the public. *Id.*

Debtor's former employees does not change the involuntary nature of the obligation. Debtor did not have an election available to opt out of New York's system entirely. New York's system of unemployment insurance requires that all subject employers participate and file returns at specified intervals. As an employer in New York, Debtor's obligation to the State is involuntary and the first *Lorber* factor is satisfied.

2. *Imposed by, or under authority of the legislature*

New York's unemployment insurance system is laid out in the Unemployment Insurance Law which was enacted by the State legislature. The court finds that the second *Lorber* factor is satisfied.

3. *For public purposes, including the purposes of defraying expenses of government or undertakings authorized by it*

The third *Lorber* factor is easily met. The public purpose of this exaction is to provide for employees whose employment is terminated through no fault of their own. It is not for the personal benefit of the nonprofit employer but redounds to the benefit of discharged employees of the nonprofit Hospital as well as discharged employees of all entities. Replenishment of the Fund through reimbursement payments supports the government's undertaking of disbursing unemployment insurance compensation benefit payments to every eligible claimant.[14]

4. *Under the police or taxing power of the state.*

The assessment and enforcement of amounts due to the State are within the police or taxing power of the State. The court finds the fourth *Lorber* factor is met.

---

[14] The Third Circuit in *United Healthcare* drew the distinction that since reimbursement payments only compensate for the exact amount paid out in benefits by the state Department of Labor, the payments "do not raise funds to support a general government undertaking." The court disagrees that this distinction has any bearing in New York where quarterly contributions and payments in lieu of contribution are pooled and used only to pay benefits. UNEMPLOYMENT INSURANCE LAW § 550 (3). In any event, the court finds that a nonprofit entity's replenishment of the Fund through reimbursement payments sufficiently supports the government's general undertaking of providing benefits and satisfies the third prong of the *Lorber* test.

### 5. *The pecuniary obligation be universally applicable to similarly situated entities*

All New York "employers"[15] are required to make payments into the Fund. Nonprofit organizations that opt out of making quarterly contribution payments are universally obligated to make reimbursement payments. In contrast, in *Suburban II*, the claim at issue related to awards made by the State of Ohio on workers' compensation claims after the debtor, a state fund participant, defaulted as a self-insured employer. *Suburban II*, 36 F.3d at 487 – 88. Of particular importance in the Sixth Circuit's determination was the fact that the debtor's liability arose "solely by virtue of its default," and was not a liability "universally applicable to similarly situated persons or firms." *Id.* at 489. In this case, the Hospital's liability for reimbursement payments did not arise from any default by the Debtor and the pecuniary obligation to make reimbursement payments is universally applicable to similarly situated nonprofit entities. Accordingly, the court finds the first *Suburban II* factor to be met.

### 6. *Granting priority status to the government would not disadvantage private creditors with like claims*

A second distinction between the New York statute and the Ohio statutory scheme under consideration in *Suburban II*, is the fact that there is no option for self-insurance in New York's unemployment insurance system. The State is responsible for the outlay to former employees eligible to receive unemployment insurance compensation benefits whether the employer organization pays quarterly contributions or makes reimbursement payments. Since the New York unemployment insurance system is monopolistic, there is no similarly situated private creditor with like claims that could be prejudiced.

Some courts have considered whether a surety may function as a similarly situated creditor with a like claim. In *Boston Regional*, the fact that Massachusetts could require a surety

---

[15] "Employers" is defined by statue in § 570.

from nonprofit organizations that opted for reimbursement payments in lieu of contributions "tipped the scales" in deciding the case. *Boston Reg'l Med. Ctr.*, 291 F.3d at 127. In *United Healthcare*, the Third Circuit referenced the bankruptcy court's earlier decision, which discussed whether "a surety with the same claim as the government claim could be disadvantaged if the government claim received priority." *United Healthcare*, 396 F.3d at 257 (citing *In re United Healthcare Sys., Inc.*, 282 B.R. 330, 340 – 41 (Bankr. D.N.J. 2002)). New York argues that in all the cases relied on by the Debtor, which found that payments in lieu of contributions were not taxes entitled to priority, the states' statutory schemes gave the government "the discretion to require that non-profit employers file a surety bond as a condition for utilizing the benefit of the reimbursement method for payment of liabilities." (State's Resp. Mem. 13 – 14). Debtor argues that the State's reliance on this distinction is misplaced because FUTA authorizes states to "provide safeguards" to secure payment by an electing nonprofit organization, and that New York, like Massachusetts, voluntarily chose not to provide itself with any security. 26 U.S.C. § 3309 (a)(2); (Debtor's Reply Mem. 10 – 11).

Although FUTA does authorize states to provide safeguards, and the legislatures of New Jersey, Massachusetts and Michigan specifically enacted measures that enable these states, in their discretion, to require a surety in the form of a bond or deposit from an electing nonprofit organization, New York's legislature has not enacted any such measure. N.J.S.A. § 43:21-7.2(h); Mass. Gen. Laws ch. 151A, § 14A(e); Mich. Comp. Laws § 421.13a(4). Without authority from the state legislature, the Commissioner in New York has *no discretion* to require a surety from a nonprofit entity that makes the election. For this and the reason cited above, there is no similarly situated creditor with like claims in New York that would be prejudiced by granting priority status to the government.

Having found that the liability for reimbursement payments meets the original *Lorber* factors and also satisfies the additional criteria set forth in *Suburban II*, to the extent relevant in the Second Circuit, this court finds that the liability constitutes a tax. The court must next determine whether the tax is entitled to priority under Bankruptcy Code section 507 (a)(8)(D) and/or alternatively, (E).

### *PRIORITY AS AN EMPLOYMENT TAX UNDER CODE § 507(a)(8)(D)*

The State alleges that since the reimbursement obligation was based on wages paid to the Debtor's employees and these wages were used by the State to calculate the benefits payable to employees, the amount of which directly corresponds to the amount of the reimbursement obligation, the tax should have priority as an "employment tax on a wage, salary, or commission" pursuant to Code section 507(a)(8)(D). The Bankruptcy Code does not define the key phrase, "employment tax on a wage, salary, or commission." Bankruptcy courts have found that unemployment compensation *contribution* payments qualify as an employment tax under this section. *See Matter of Lackawanna Detective Agency, Inc.*, 82 B.R. 336 (Bankr. D. Del.1988); *In re Skjonsby Truck Line, Inc.*, 39 B.R. 971 (Bankr. D.N.D. 1984); *In re Continental Minerals Corp.*, 132 B.R. 757, 758-759 (Bankr. D. Nev. 1991). Other courts have found that unemployment insurance contributions are entitled to priority under either Code section 507(a)(8)(D) or (E). *In re Cal-Test Enter., Inc.*, No. 82-10178 M, slip op. at 8 (Bankr. W.D.N.Y. Aug. 8, 1985); *In re Cottage Grove Hosp.*, 265 B.R. 241 (Bankr. D. Or. 2001).

It is arguable that for a tax to be classified as an "employment tax" pursuant to Code section 507(a)(8)(D), that it be limited to a tax which is capable of calculation based upon, or part of an individual's wages, salary or commission. Courts that have specifically focused on this genre of tax, namely, the obligation to make payments in lieu of contributions, have honed in

on the contingent nature of the tax and the fact that when the tax obligation is no longer contingent, that it may be totally divorced in time from the time the employment wages were paid and after the employee has been discharged. The bankruptcy court's opinion in *In re Boston Reg'l Med. Ctr.*, 256 B.R. 212 (Bankr. D.Mass 2000) concluded that payments in lieu of contributions do not qualify for priority under Code section 507(a)(8)(D), a position with which this court agrees. *In re Boston Reg'l Med. Ctr.*, 256 B.R. at 226 – 227, *aff'd, Mass. Div. of Employment & Training v. Boston Reg'l Med. Ctr. (In re Boston Reg'l Med. Ctr.)*, 265 B.R. 838 (BAP 1st Cir. 2001), *rev'd, Mass. Div. of Employment & Training v. Boston Reg'l Med. Ctr. (In re Boston Reg'l Med. Ctr.)*, 291 F.3d 111 (1st Cir. 2002).[16]

### *PRIORITY AS AN EXCISE TAX UNDER CODE § 507(a)(8)(E)*

The State alternatively characterizes the Debtor's reimbursement liability as an "excise" tax. Again, the Bankruptcy Code is silent as to the definition of either "excise" or "excise tax." *CF & I Fabricators*, 518 U.S. at 220. However, when assessing priority status, many courts have found that an excise tax is "a pecuniary burden laid upon individuals or their property, regardless of their consent, for the purpose of defraying the expenses of government or of undertakings authorized by it." *City of New York v. Feiring*, 313 U.S. 282 (1941) (citing *New Jersey v. Anderson*, 203 U.S. 491 (1906). The Fourth Circuit defined "excise tax" as being an "indirect tax, one not directly imposed upon persons or property" and "one that is imposed on the

---

[16] The Bankruptcy Appellate Panel ("BAP") for the First Circuit affirmed the bankruptcy court's holding. *Mass. Div. of Employment & Training v. Boston Reg'l Med. Ctr. (In re Boston Reg'l Med. Ctr.)*, 265 B.R. 838 (BAP 1st Cir. 2001). The BAP agreed that payments in lieu of contributions constitute a tax, and that those payments were not entitled to priority as being an employment tax under Bankruptcy Code section 507(a)(8). The First Circuit Court of Appeals reversed the bankruptcy court's finding that payments in lieu of contributions constitute taxes. *Mass. Div. of Employment & Training v. Boston Reg'l Med. Ctr. (In re Boston Reg'l Med. Ctr.)*, 291 F.3d 111 (1st Cir. 2002). As a result, the First Circuit opinion never addressed what constitutes a tax "on a wage, salary, or commission" within the meaning of Code section 507(a)(8)(D). Although the bankruptcy court decision was reversed and does not reflect the law in the First Circuit, this court adopts as sound, the reasoning of that court on the issue of what constitutes an employment tax.

performance of an act, the engaging in any occupation, or the enjoyment o[f] [sic] a privilege." *New Neighborhoods Inc. v. W. Va. Workers' Comp. Fund*, 886 F.2d 714, 719 (4th Cir. 1989) (citing *In re Beaman*, 9 B.R. 539, 541 (Bankr. D. Or. 1980); *In re Tri-Manufacturing and Sales Co.*, 82 B.R. 58, 60 (Bankr. S.D. Ohio 1988). The court finds that the Claim at issue satisfies the foregoing definitions. The Debtor's reimbursement obligation represents an excise tax imposed on the incident of conducting a business and a transactional cost arising from the act of employing workers. The employment that generated the obligation and upon which the liabilities were assessed occurred pre-petition. Accordingly, the Debtor's reimbursement obligation is found to be an excise tax entitled to priority under the Bankruptcy Code.

## CONCLUSION

For the foregoing reasons, the Debtor's Objection to Claim No. 179 is overruled and the Claim is allowed as a priority claim under the provisions of 11 U.S.C. section 507(a)(8)(E).

So ordered.

Date: May 7, 2010
Syracuse, New York

Hon. Margaret Cangilos-Ruiz
United States Bankruptcy Judge